UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| JOSEPH R. PATTERSON,<br><br>                    Petitioner,<br><br>        vs.<br><br>AMBER PIRRAGLIA[1], Interim Warden<br>of the South Dakota State<br>Penitentiary,<br><br>                    Respondent. | 4:24-CV-04014-VLD<br><br><br>MEMORANDUM OPINION |

**INTRODUCTION**

This matter is pending before the court pursuant to the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Joseph R. Patterson, a person incarcerated pursuant to a judgment of a South Dakota state court. See Docket No. 1. Now pending are respondent's motions to dismiss Mr. Patterson's petition without holding an evidentiary hearing. See Docket Nos. 9 & 10. Mr. Patterson opposes the motions. See Docket No. 21. This matter is assigned to this magistrate judge on the consent of all parties pursuant to 28 U.S.C. § 636(c). Docket No. 5.

---

[1] Mr. Patterson named Teresa Bittinger as respondent in his petition, but Ms. Bittinger is no longer the warden of the South Dakota State Penitentiary. Pursuant to Fed. R. Civ. P. 25(d), the court substitutes Amber Pirraglia, the interim warden, as respondent.

## FACTS

### A.    Trial Court Proceedings

The following information is a summary of the proceedings at the trial

level in Mr. Patterson's case.  More detailed information is discussed in

connection with each separate claim for relief in the DISCUSSION section of this

opinion.

Mr. Patterson was first charged with aggravated battery of an infant and

aggravated assault via complaint on October 11, 2013.  State v. Patterson,

41CRI13-598 at 1 (South Dakota Circuit Court for the Second Judicial

Circuit).[2]  The infant associated with that complaint, a 26-month-old child,

T.R. (or "the victim"), died the same day.  Id. at 4, 12, 2372 (Jury Trial

Transcript Vol. 1 ("JTT1") at 31), 2809 (Jury Trial Transcript Vol. 2 ("JTT2") at

221).  Mr. Patterson was then indicted on five counts:  second-degree murder,

first-degree manslaughter (two counts), aggravated battery of an infant, and

abuse or cruelty to a minor.  Id. at 12-15.

Prior to trial, Mr. Patterson's counsel filed a notice that he intended to

introduce third-party perpetrator evidence to the effect that the victim's

daycare provider, Marilyn Knurck, had proximity and opportunity to hurt the

victim in the hours before his death and that she had injured other children.

Id. at 941-48.  At the time, there were pending felony charges against

---

[2] The state court records concerning Mr. Patterson were provided to this court
in PDF format with continuously numbered pages.  It is to these continuous
numbers the court cites when citing to a state court record.  If the record cited
to is also a transcript, the court will include a parenthetical citation to the page
of the transcript as produced by the court reporter.

Ms. Knurck for child abuse.  Id. at 947.  The prosecution filed a motion in limine to prohibit Mr. Patterson from introducing evidence that a third party may have committed the offenses charged.  Id. at 198.

The trial court granted in part Mr. Patterson's counsel's notice, ruling that evidence could be introduced regarding (1) an incident on October 9, 2014, involving a child, C.L., whom Knurck was alleged to have caused head injuries to, including a skull fracture and brain bleed; (2) an incident on March 27, 2015, regarding a child, H.S., that Knurck was alleged to have injured in the ribs, stomach and back; and (3) evidence as to Knurck and Carrie Nytroe.[3]  Id. at 947, 1577.

Mr. Patterson filed a motion in limine to prevent the prosecution from introducing evidence that T.R. died as a result of "abusive head trauma" or "nonaccidental" trauma; the motion also asserted the state's experts were not qualified to testify.  Id. at 240-43; 858.  The trial court found each of the state's experts were qualified to testify, that their opinions were relevant, and based upon reliable evidence.  Id. at 856-65.  The trial court specifically found that the term "Abusive Head Trauma" ("AHT") was a formal diagnosis recognized by the American Academy of Pediatrics and the International Classification of Diseases and, as such, the court allowed the state's experts to use this term in their testimony.  Id. at 859-65.

Prior to trial, the prosecution sought permission to introduce evidence under Rule 404(b) of the rules of evidence.  Specifically, the state sought to

---

[3] See Section E of the discussion, infra.

3

introduce evidence from Jasmin Leach, a former girlfriend of Mr. Patterson's, that Mr. Patterson had physically abused both her and her young toddlers.  Id. at 145-46, 180-97, 382-85, 793-816.  Trial counsel for Mr. Patterson opposed the notice.  Id. at 760-75.  The trial court ruled that specific instances of abuse perpetrated by Mr. Patterson on the children could be admitted, but that any alleged abuse of the woman by Mr. Patterson was not admissible.  Id. at 910-11.

The trial took place over 10 days.  Cf. id. at 1665-66, 4229 (Jury Trial Transcript Vol. 10 ("JTT10") at 1).  The state called 9 expert medical witnesses to testify and numerous fact witnesses.  Id. at 1665-66.  Trial counsel for Mr. Patterson called 5 expert medical witnesses to testify, an attendant/photographer at T.R.'s autopsy, and two police sergeants.  Id. at 1666, 3378, 3386 (Jury Trial Transcript Vol. 6 ("JTT6") at 5, 13).  Mr. Patterson did not testify at his trial.

The basic story that was told at trial was that on October 9, 2013, T.R. was left alone in Mr. Patterson's care while his mother went to the gym.  Id. at 2359-61 (JTT1 at 18-20).  Approximately 8 minutes after she left, T.R.'s mother received a phone call from Mr. Patterson saying that T.R. was not breathing and was nonresponsive.  Id. at 2361-62 (JTT1 at 20-21).  T.R.'s mother told Mr. Patterson to call 911 and she immediately drove back to Mr. Patterson's apartment.  Id. at 2362 (JTT1 at 21).  Mr. Patterson told police and emergency medical responders that T.R. had choked on a red strawberry fruit snack while Mr. Patterson had left him alone momentarily to go to the bathroom.  Id. at

4

2363-64, 2368 (JTT1 at 22-23, 27).  Mr. Patterson showed the police a piece of
red fruit snack that Mr. Patterson had supposedly taken from T.R.'s mouth.
Id. at 2372 (JTT1 at 31).  The following day, investigators found a similar treat
ground into the carpet.  Id. at 2376-77 (JTT1 at 35-36).  Testing of the fruit
snack revealed T.R.'s DNA.  Id. at 2377 (JTT1 at 36).  Mr. Patterson told police
that earlier he had been watching ESPN on television, but that before he went
to the bathroom, he put the program Turtle Tales on the television for T.R. to
watch.  Id. at 2921 (Jury Trial Transcript Vol. 3 ("JTT3") at 67).  Before leaving
the living room to go to the bathroom, Mr. Patterson told police T.R. was sitting
on the couch eating his fruit snacks and contentedly watching Turtle Tales.  Id.
at 2368-69 (JTT1 at 27-28).

When T.R.'s mother arrived home (before any emergency personnel), she
immediately started CPR.  Id. at 2371 (JTT1 at 30).  Although T.R. had mucus
in his throat, she found nothing solid.  Id. at 2413 (JTT1 at 72).  Likewise,
when emergency responders took over tending to T.R., they found nothing
blocking T.R.'s airway.  Id. at 2891 (JTT3 at 37).  One paramedic testified this
was odd because usually if a person choked on something severely enough to
cause cardiac arrest and cessation of breathing, the object will be so far back
in the throat that it cannot be reached with a finger.  Cf. id.  T.R. was placed on
life support, but he never regained consciousness.  Id. at 2721-27, 2803-09
(JTT2 at 133-39, 215-21).  A police officer who responded to the 911 call
testified that college football was on the television and that he was the person

who shut off the television before leaving the apartment.  State v. Patterson, 41CRI13-598 at 5882 (Jury Trial Transcript Vol. 4 ("JTT4") at 82).

When medical staff at the hospital began treating T.R., they noticed medical findings that were inconsistent with Mr. Patterson's story of choking on a fruit snack.  Id. at 2632 (JTT2 at 44).  The three most significant findings were subdural hematomas, or blood that had collected under the dura, a tough covering that encases the brain; retinal hemorrhages of a type and a degree that were almost always associated with head trauma; and swelling of T.R.'s brain, which was slight at first, but progressed significantly.  The state's experts testified these findings were consistent with trauma to the head and not consistent with choking.  See id. at 2352, 2631-34, 2753, 2761, 2785 (JTT1 at 11, JTT2 at 43-46, 165, 173, 197).  An autopsy performed on T.R. later verified four subdural hematomas on the top of T.R.'s head which the pathologist associated with external trauma to the head.  Id. at 2364-65, 2381 (JTT1 at 23-24, 40).

The defense experts testified that whatever caused T.R.'s death, it occurred very rapidly because T.R. was only alone with Mr. Patterson a matter of minutes.  The defense experts testified that if trauma to T.R.'s head sufficient to cause instantaneous death was the cause of his death, there would have been external bruises (there were none), there would have been skull fractures (there were none), there would have to be visible damage to the brain tissue (there was none), and there would have been much more blood in the subdural hematomas (which contained only a few teaspoons of blood).  See,

6

e.g., id. at 3417-18 (JTT6 at 44-45).  The defense experts testified you cannot reach a conclusion that a child has died as a result of trauma to the head—especially where the child's death is brought about so rapidly—without any of these markers showing an insult to the tissues of the head and brain.  See, e.g., id. at 3595 (JTT6 at 222).

The jury convicted Mr. Patterson of second-degree murder, first-degree manslaughter, and aggravated battery of an infant.  Id. at 4355 (JTT10 at 127).  The trial court imposed a mandatory term of life imprisonment.  Id. at 4452.

**B.    Direct Appeal**

Mr. Patterson pursued a direct appeal of his conviction and sentence.  Among the issues he raised in that appeal were the following:  (1) whether the trial court erred by allowing the prosecution to argue a factual theory of guilt and motive that was not supported in the evidence; (2) whether the trial court erred in allowing the prosecution to introduce expert opinions that were impermissibly intrusive; and (3) whether the trial court erred in prohibiting Mr. Patterson from introducing additional instances of alleged child abuse committed by a potential third party perpetrator.  State v. Patterson, No. 27736 at 5 (S.D.).

The South Dakota Supreme Court rejected these claims.  Regarding the first claim, the court characterized the claim as one alleging prosecutorial misconduct and reviewed the issue under the abuse of discretion standard.  State v. Patterson, 904 N.W.2d 43, 49 (S.D. 2017).  The court noted that there were facts in evidence which could allow inferences to be drawn that supported

the prosecution's theory.  Id. at 50.  The court also noted that both the prosecution and the defense have considerable latitude in closing arguments. Id.  Even if prosecutorial misconduct occurred, the court concluded it did not deprive Mr. Patterson of a fair trial.  Id.

As to the second issue, the court analyzed this issue as strictly an evidentiary issue and applied the abuse of discretion standard.  Id. at 50-51. The court concluded that none of the nine expert witnesses who testified for the prosecution ever "improperly expressed what conclusions the jury should reach."  Id. at 50.  The court noted that Mr. Patterson was able to fully develop and present a competing theory through his own experts and cross-examination of the prosecution experts.  Id. at 51.  The court concluded that "[w]ith this amount and quality of expert testimony before it, the jury had an adequate opportunity to make a determination as to the credibility of the evidence" so "the province of the jury was not invaded."  Id.

As to the third-party perpetrator evidence, the court concluded that in deciding which evidence to allow and which evidence to exclude the trial court properly considered and balanced relevance, proximity in time and location to T.R.'s death, and the third party's possible motives.  Id.  The supreme court held the trial court had not abused its discretion when so ruling.  Id.

## C.    State Habeas Proceedings

Following the conclusion of his direct appeal, Mr. Patterson filed a habeas petition in state court.  Among the claims raised in that petition was a claim that Mr. Patterson's right to effective assistance of counsel under the

Sixth Amendment was violated when trial counsel failed to call Dr. John Sabow or some other similarly qualified expert to testify as an expert at the trial that T.R. could not have died from abusive head trauma.  Patterson v. Sullivan, 41CIV18-672, at 8, 395-96 (South Dakota Circuit Court for the Second Judicial Circuit).

The state habeas court held evidentiary hearings on three days (Sept. 1 & 2, 2022, and Jan. 12, 2023).  Id. at 534-766, 767-966, 969-1049.  Thereafter, the court issued a memorandum opinion and order denying Mr. Patterson's request for relief.  Id. at 1128-40.  This was later supplemented with detailed findings of fact and conclusions of law.[4]  Docket No. 9-1.

Mr. Patterson sought a certificate of probable cause from the trial court, which that court denied.  Patterson, 41CIV18-672 at 1141-42, 1147, 1188. Mr. Patterson then sought a certificate of probable cause from the South Dakota Supreme Court, which also denied the request.  Patterson v. Sullivan, No. 30460 at 2-26, 166 (S.D.).

---

[4] The Memorandum Opinion was authored by the state habeas court itself.  See Patterson v. Sullivan, 41CIV18-672 at 1140.  The court then directed respondent as the prevailing party to draft the findings of fact and conclusions of law incorporating the decision set forth in the Memorandum Opinion.  Id. The state habeas court record reveals no objections lodged by Mr. Patterson to the respondent's version of the Findings of Fact and Conclusions of Law.  See SDCL § 15-6-52(a) (when findings of fact and conclusions of law are written and proposed by the prevailing party, the losing party has 5 days to object to the same and the circuit court may not sign the proposed findings and conclusions until expiration of the time for objecting).  The proposed findings and conclusions were accepted and signed by the state court, so they represent the court's decision.

D.    **Mr. Patterson's Federal Habeas Petition**

Mr. Patterson timely filed his § 2254 habeas petition with this court.  In

that pleading, he presents the following four claims for relief:

> 1.    Trial counsel provided constitutionally ineffective
> assistance of counsel in violation of Mr. Patterson's Sixth
> Amendment rights by failing to present affirmative expert
> testimony that the victim did not die as a result of abusive head
> trauma and that the cause of the victim's death was choking.
>
> 2.    Mr. Patterson's Sixth Amendment right to a fair trial
> was violated when the trial court allowed the prosecution to argue
> a theory of Mr. Patterson's motive that was not supported by
> evidence in the record.
>
> 3.    Mr. Patterson's Sixth Amendment right to a fair trial
> was violated when the trial court allowed the prosecution to
> present expert testimony that the victim died from "abusive" head
> trauma "and other similar diagnoses."
>
> 4.    Mr. Patterson's Sixth Amendment right to a fair trial
> was violated when the trial court prohibited him from presenting
> additional evidence that a third-party perpetrator was responsible
> for the victim's injuries.

Docket No. 1 at 6-8.  Respondent moves to dismiss claim one [Docket No. 9]

and claims two through four [Docket No. 10], without holding an evidentiary

hearing.  Mr. Patterson, through his counsel, resists both motions.  See Docket

No. 21.

## DISCUSSION

A.    **Scope of a § 2254 Petition**

A state prisoner who believes he is incarcerated in violation of the

Constitution or laws of the United States may file a writ of habeas corpus

pursuant to 28 U.S.C. § 2254.  The Anti-Terrorism and Effective Death Penalty

Act (AEDPA) constrains federal courts to exercise only a "limited and deferential

review of underlying state court decisions." Osborne v. Purkett, 411 F.3d 911,
914 (8th Cir. 2005) (citation omitted).  A federal court may not grant a writ of
habeas corpus unless the state court's adjudication of a claim "resulted in a
decision that was contrary to, or involved an unreasonable application of,
clearly established Federal law."  28 U.S.C. § 2254(d)(1).  A state court decision
is "contrary to" clearly established federal law if it "applies a rule that
contradicts the governing law set forth in [Supreme Court] cases" or if it
"confronts a set of facts that are materially indistinguishable from a decision of
th[e] Court and nevertheless arrives at a result different from [the Court's]
precedent."  Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  A federal habeas
court may not issue the writ merely because it concludes the state court
applied the clearly established federal law erroneously or incorrectly.  Id. at
411.  "Rather, that application must also be *unreasonable.*"  Id. (emphasis
added).

The state court's factual findings are presumed to be correct, and a
federal habeas court may not disregard the presumption unless specific
statutory exceptions are met.  Thatsaphone v. Weber, 137 F.3d 1041, 1046
(8th Cir. 1998); 28 U.S.C. § 2254(e)(1).  A federal habeas court must "more
than simply disagree with the state court before rejecting its factual
determinations.  Instead, it must conclude that the state court's findings
lacked even 'fair support' in the record."  Marshall v. Lonberger, 459 U.S. 422,
432 (1983).

11

Mr. Patterson urges this court to apply the standard under Fed. R. Civ. P. 12(b)(6) to respondent's motion.  Docket No. 21 at 20.  Specifically, he states this court must accept as true all well-pleaded factual allegations in his petition and draw all reasonable inferences in favor of him.  Id.

It is true that the Federal Rules of Civil Procedure apply in § 2254 habeas petitions to the extent the rules do not conflict with the habeas statutes themselves or with the Rules Governing Section 2254 cases.  See Rule 12, Rules Governing Section 2254 cases.  There is, however, a potential conflict between the Rule 12(b)(6) standard and § 2254.

Specifically, under Rule 12(b)(6) a court should assume the truth only of "well-pleaded factual allegations," and then may proceed to determine whether the allegations "plausibly give rise to an entitlement to relief."  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  But under § 2254, the state court's factual findings are entitled to a presumption of correctness which can only be overcome by a showing by the petitioner of clear and convincing evidence of the error of those findings.  28 U.S.C. § 2254(e)(1).  This court must affirm a state court's factual findings if there is a reasonable basis for those findings in light of the evidence presented.  Cf. § 2254(d)(2).

Therefore, to the extent a habeas petitioner sets forth facts in his petition which conflict with the state court's reasonable factual findings, this court may

not, as Rule 12(b)(6) requires, assume the truth of the facts in the petition because to do so would contradict the terms of § 2254(d)(2) and (e)(1).[5]

If there is no conflict between the well-pleaded facts alleged in the petition and the state court's factual findings, then this court could apply the standard under Rule 12(b)(6) and assume the truth of those facts.  See Rule 12 of the Rules Governing Section 2254 Cases.  It is with these principles that this court considers respondent's motions to dismiss.

**B.    Claim 1--Ineffective Assistance of Counsel**

**1.    Standard Governing Claims of Ineffective Assistance**

The Sixth Amendment of the Constitution of the United States affords a criminal defendant with the right to assistance of counsel.  U.S. CONST. amend. VI.  The Supreme Court "has recognized that 'the right to counsel is the right to effective assistance of counsel.' "  Strickland v. Washington, 466 U.S. 668, 686 (1984) (quoting McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)).  Strickland is the benchmark case for determining "if counsel's assistance was so defective as to" violate a criminal defendant's Sixth Amendment rights and "require reversal of a conviction."  Id. at 687; United States v. Kehoe, 712 F.3d 1251, 1253 (8th Cir. 2013).

---

[5] The conflict between what a petitioner says the facts are in his petition and what the state court's findings of fact are could be resolved by deeming the petitioner's assertion of fact "implausible," to use the language from Iqbal.  But that would be a misuse of the term "implausible" in the situation where the petitioner's allegation is plausible, but the state court's factual findings are also plausible because there is a reasonable basis for those findings in the evidence in the state court record—in other words, where the factual findings could have gone either way in state court or where competing facts were closely matched.

"When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 687-88. The defendant must also show that counsel's unreasonable errors or deficiencies prejudiced the defense and affected the judgment. Id. at 691. The defendant must show "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695. In sum, a defendant must satisfy the following two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Id. at 687.

"There is a presumption that any challenged action was sound trial strategy and that counsel rendered adequate assistance and made all significant decisions in the exercise of professional judgment." Hall v. Luebbers, 296 F.3d 685, 692 (8th Cir. 2002) (quoting State v. Hall, 982 S.W.2d 675, 680 (Mo. 1998)). It is the petitioner's burden to overcome this presumption, and a "petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test." Id. (citing Wainwright v. Lockhart, 80 F.3d 1226, 1233 (8th Cir. 1996)).

14

Counsel's conduct must be judged by the standards for legal representation which existed at the time of the representation, not by standards promulgated after the representation.  See Bobby v. Van Hook, 558 U.S. 4, 7-9 (2009) (*per curiam*).  " 'American Bar Association standards and the like' are 'only guides' to what reasonableness means, not its definition." Id. at 8 (quoting Strickland, 466 U.S. at 688).

The Supreme Court distinguishes between those cases in which the new evidence "would barely have altered" the evidence presented and those that would have had a reasonable probability of changing the result.  Porter v. McCollum, 558 U.S. 30, 41 (2009) (*per curiam*).  In assessing the prejudice prong, courts should consider "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding"—and "reweigh it against the evidence in aggravation." Id. (quoting Williams v. Taylor, 529 U.S. 362, 397-98 (2000)) (alterations omitted).  It is not necessary for the petitioner to show "that counsel's deficient conduct more likely than not altered the outcome" of his case, only that there is "a probability sufficient to undermine confidence in [that] outcome." Id. at 44 (quoting Strickland, 466 U.S. at 693-94).

Finally, "[i]neffectiveness of counsel is a mixed question of law and fact and thus on habeas review, a federal court is not bound by a state court's conclusion that counsel was effective." Whitehead v. Dormire, 340 F.3d 532, 537 (8th Cir. 2003).  "However, 'state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of

§ 2254(d).' " Id. (citing Strickland, 466 U.S. at 698). That is, "[a] state court's findings of fact are entitled to a presumption of correctness." Miller v. Dormire, 310 F.3d 600, 603 (8th Cir. 2002). Additionally, "[j]udicial scrutiny of counsel's performance must be highly deferential," with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.

"The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." Harrington v. Richter, 562 U.S. 86, 105 (2011) (citations omitted). "Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d)." Id. The inquiry when a Strickland claim is raised in a § 2254 petition is "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.

As the state habeas court recognized, a claim of ineffective assistance of trial counsel requires Mr. Patterson to show that his lawyers' representation of him fell below an objective standard of reasonableness and thereby prejudiced his case. See Patterson v. Sullivan, 41CIV18-672 at 1132-33; Skillicorn v. Luebbers, 475 F.3d 965, 973 (8th Cir. 2007) (citing Strickland, 466 U.S. at 687). In a petition under 28 U.S.C. § 2254, however, Mr. Patterson must do more: he must show that the state court "applied Strickland to the facts of his case in an objectively unreasonable manner." Skillicorn, 475 F.3d at 973 (quoting Bell v. Cone, 535 U.S. 685, 699 (2002)).

16

### 2.    Application of **Strickland** to Mr. Patterson's Claim

At trial, Mr. Patterson's former counsel presented testimony of five experts:  (1) Dr. Julie Mack, a board-certified radiologist; (2) Dr. Khaled Tawansy, an ophthalmologist and founder of Children's Retina Institute; (3) Dr. Waney Squier, a pediatric neuropathologist; (4) Dr. Roland Auer, a neuropathologist; and (5) Dr. Janice Ophoven, a consulting pediatric forensic pathologist.  State v. Patterson, 41CRI13-598 at 1666, 1893, 1975, 2021, 3917 (Jury Trial Transcript Vol. 8 at 6).

In his brief before this court, Mr. Patterson describes his defense experts' testimony at trial as follows:

Dr. Mack contested the prosecution's experts' conclusion that the victim definitely had a subdural hematoma, testified that the victim's scalp tissues did not show swelling on the day of the incident, and that the CT scan of the victim's brain was consistent with choking and resuscitation.  Docket No. 21 at 9-11.

Dr. Tawansy testified that the victim's retinal hemorrhages were the result of choking and that choking most likely caused the victim to quit breathing and his heart to quit pumping.  Cf. id. at 11.

Dr. Squier refuted the prosecution's experts' testimony that the victim experienced trauma, testifying that there was insufficient blood to indicate trauma and there should have been skull fractures if there was trauma.  Id. at 11-12.  Dr. Squier testified that the victim's medical records and death were

17

consistent with choking and the amount of CPR applied to the victim.  Id. at 12.

Dr. Auer testified that the victim's death was consistent with choking. Id.  Dr. Auer refuted the prosecution's experts' testimony that trauma caused the victim's death, stating that there was no tissue damage within the victim's brain as you would expect to see if there had been trauma and no skull fractures.  Id.

Dr. Ophoven testified the cause of the victim's death was choking.  Id. at 12-13.  She testified she had never seen a case of death caused by trauma to the head where there was no evidence of any impact to the head.  Id. at 13.

Mr. Patterson's ineffective assistance claim in this federal habeas case is stated as follows:

> Mr. Patterson's trial counsel was ineffective for purposes of the Sixth Amendment by failing to present the necessary expert testimony to refute the prosecution's theory of the case.  . . . Trial counsel should have presented expert testimony that abusive head trauma could not have been the cause of death given the nature of the sudden death of the alleged victim.  Trial counsel should also have presented expert testimony that the child died from choking.

Docket No. 1 at 7.

The court understands Mr. Patterson to be asserting in his petition that trial counsel should have presented expert testimony that did two things: (1) refuted the prosecution's theory that the victim's death was caused by abusive head trauma and (2) affirmatively establish that the cause of the victim's death was choking.  Id.  But, according to Mr. Patterson's summary of

what his own experts testified to at trial, the defense experts *did* address exactly these two issues.  Docket No. 21 at 10-13.

Mr. Patterson later clarifies in his brief that defense counsel should have presented expert testimony that established that observable brain tissue damage is a medically necessary component before a death can be attributed to abusive head trauma.  Docket No. 21 at 23.  Although he concedes that defense experts testified at trial that they would have expected to see brain tissue damage if the victim's death was attributable to head trauma, this testimony "is a far cry from explaining that brain tissue damage *must* be present for [abusive head trauma] to be the cause of sudden death."  Id.  Because trial counsel did not present this testimony, it "cost Mr. Patterson the best defense he had against the charges."  Id.

Of course, the Sixth Amendment does not guarantee a criminal defendant "the best defense."  It guarantees effective assistance of counsel.  Strickland, 466 U.S. at 689.  "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."  Harrington, 562 U.S. at 105 (quoting Strickland, 466 U.S. at 690).

To prevail on an ineffective assistance claim before the state habeas court, Mr. Patterson had to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed" by the Constitution.  Strickland, 466 U.S. at 687.  To prevail before this court, Mr. Patterson must show that the state habeas court's rejection of his ineffective assistance claim

19

was either (1) based on an unreasonable application of Strickland or (2) was based on factual findings that did not enjoy reasonable support in the record, or both. Bell, 535 U.S. at 699; Skillicorn, 475 F.3d at 973; 28 U.S.C. § 2254(d).

Despite this requirement, Mr. Patterson's argument does not focus on or even mention the state habeas court decision. Docket No. 21 at 21-38. Instead, he presents *de novo* arguments under Strickland. Id.

But § 2254 does not allow this court to apply Strickland *de novo* to Mr. Patterson's ineffective assistance claim. Harrington, 562 U.S. at 101 (stating, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard."). This court is constrained to considering whether the state habeas court (1) unreasonably applied federal law as determined by the Supreme Court and (2) whether the findings of fact made by the state court enjoy reasonable support in the record. 28 U.S.C. § 2254(d). State court findings of fact are presumed to be correct unless Mr. Patterson rebuts that presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### a. Are Findings of Fact Reasonably Supported?

### i. Evidence in the Record from Dr. Sabow

Dr. Sabow testified as follows. He testified that the first CT scan done of T.R. did not show a subdural hematoma, contrary to what the treating radiologist indicated. Patterson v. Sullivan, 41CIV18-672 at 635, 651, 658-59, 666-67 (9-1-22 Habeas Transcript ("HT1") at 102, 118, 125-26, 133-34). He

20

testified there was no skull fracture or tissue damage to T.R.  Id. at 670, 683,

685-86, 689-90 (HT1 at 137, 150, 152-53, 156-57).  He testified there was pus

in the victim's lungs.  Id. at 698-700 (HT1 at 165-67).  He stated that the brain

bleeding found upon autopsy was due to T.R. being given blood thinner

(heparin) while he was kept on life support so that his organs could be

harvested.  Id. at 667-68, 679, 683 (HT1 at 134-35, 146, 150).

On cross examination, Dr. Sabow agreed that the presence of a subdural

hematoma and retinal hemorrhages were consistent with shaken trauma or

repetitive blows.  Id. at 738-39 (HT1 at 205-06).  He also agreed severe brain

injury could occur without coup or contrecoup.[6]  Id. at 739 (HT1 at 206).  Dr.

Sabow testified that parenchymal[7] (tissue) injury happens both when the brain

is deprived of oxygen and from abusive head trauma.  Id. at 779-80 (9-2-22

Habeas Transcript ("HT2") at 13-14).  He agreed that neuron[8] damage is a form

of parenchymal injury.  Id.  He agreed that the absence of external evidence of

---

[6] "When there is a direct blow to the head, the bruising of the brain and the damage to the internal tissue and blood vessels is due to a mechanism called coup-contrecoup.  A bruise directly related to trauma at the site of impact is called a coup lesion (pronounced COO).  As the brain jolts backward, it can hit the skull on the opposite side and cause a bruise called a contrecoup lesion." *Traumatic Brain Injury*, JOHNS HOPKINS MED., https://www.hopkinsmedicine. org/health/conditions-and-diseases/traumatic-brain-injury (last visited Dec. 26, 2024) [https://perma.cc/HZD2-YBX4].

[7] "Parenchyma" is "[t]he active tissue or part of an organ, which performs the function of the organ, as distinguished from the framework or supporting tissues."  J.E. SCHMIDT, M.D., ATT'YS' DICTIONARY OF MED. (2024).

[8] A "neuron" is "[t]he structural and functional unit of the nervous system, also known as a nerve cell."  Id.

trauma, the absence of skull fractures, the absence of contusions, and the absence of a massive subdural hemorrhage did *not* rule out abusive head trauma in T.R.'s case.  Id. at 798-99 (HT2 at 32-33).  Dr. Sabow explained that a focal parenchymal injury was the same thing as a contusion to the brain.  Id. at 801 (HT2 at 35).

Dr. Sabow explained that focal injuries[9] (which can be seen) result from direct impact to the head and can be seen grossly on inspection of the brain. Id. at 817-18 (HT2 at 51-52).  Focal injuries include scalp laceration, contusion, skull fracture, epidural hemorrhage, subdural hemorrhage, and brain contusions.  Id. at 817 (HT2 at 51).  Diffuse injuries[10] result from inertial loading of the head and include interhemispheric subdural hemorrhage ("ISH") and traumatic diffuse axonal injury.  Id.  A head injury can be focal or diffuse and diffuse parenchymal injuries alone can be fatal.  Id. at 817-18 (HT at 51-52).

Dr. Sabow explained that parenchymal subdural hematoma is the same as ISH.  Id. at 803-04 (HT2 at 37-38).  He also agreed it is rare to find ISH without head trauma.  Id. at 808 (HT2 at 42).  Dr. Sabow agreed that Dr. Dubois found ISH present in T.R., although Dr. Sabow disagreed with Dr. Dubois' finding.  Id. at 780, 803-04, 833 (HT2 at 14, 37-38, 67); id. at 726-27, 735-36 (HT1 at 193-94, 202-03).

---

[9] A "focal brain injury" is one "that is confined to a limited region (which may be remote from the site of impact)."  Id.

[10] "Diffuse," as opposed to "focal," means "[s]cattered; not localized; not clearly limited; spread out."  Id.

Dr. Sabow testified that parenchymal injury can be the result of direct/mechanical injuries such as contusion, direct axonal injury, or laceration; but it can also result indirectly from hypoxia (deprivation of oxygen) and ischemia.  Id. at 810 (HT2 at 44).

### ii.    State Habeas Court Findings of Fact—Dr. Sabow

The state habeas court made the following findings of fact regarding Dr. Sabow's testimony.  T.R. had four types of diffuse parenchymal injuries. Docket No. 9-1 at 12.  Dr. Sabow admitted that diffuse parenchymal injuries like T.R.'s could in and of themselves be fatal.  Id.  T.R. had intracranial pressure of 61; normal intracranial pressure is around 10 with the threshold for damage to brain tissue being around 20-22.  Id.  Dr. Sabow admitted that T.R.'s brain swelling would cause parenchymal damage.  Id.

T.R. had ISH, which Dr. Sabow admitted was a form of parenchymal damage.  Id. at 13.  Dr. Sabow testified he believed T.R. died as a result of dysphagic choking.  Id.  The state habeas court summarized Dr. Sabow's testimony as stating that there needed to be massive bleeding, massive swelling, massive tissue damage, and/or massive skull fractures before T.R.'s death could be attributed to abusive head trauma.  Id. at 15.  Dr. Sabow was not able to produce any peer-reviewed medical literature to support his position.  Id.

The state habeas court found that trial counsel had sound strategic reasons for not calling Dr. Sabow at trial.  Id. at 16.  First, the court noted Dr. Sabow had embarrassed the defense by calling the jury's and the trial court's

23

attention to himself in a negative way by commenting on evidence from the gallery.[11]  Id.  Second, no medical literature supported Dr. Sabow's ultimate opinion.  Id. at 15.

And third, Dr. Sabow's performance on cross-examination at the habeas hearing itself was such that the state habeas court believed trial counsel was right to be concerned about how Dr. Sabow might have presented to the jury. Id.  Specifically, the state habeas court noted that "Dr. Sabow's testimony exhibits a penchant for overstatement, a tendency to posture himself as smarter than everyone else, and an attitude of the lone voice of reason in a crowd of incompetents that could have backfired on the defense."  Id. at 17.

The state habeas court gave examples of this characterization: Dr. Sabow testified that " 'every single' doctor who testified in the criminal case—whether treating doctors, prosecution experts or defense experts—was

---

[11] Trial counsel testified to this at the habeas hearing; it is also chronicled in the state criminal file.  While sitting in the gallery, Dr. Sabow exclaimed out loud "sustained" after an objection had been made but before the trial court ruled on the objection.  State v. Patterson, 41CRI13-598 at 6286-87 (Jury Trial Transcript Vol. 4 ("JTT4") at 184-85).  The matter was reported to the trial court, who then voir dired each member of the jury separately to see if they had heard and, if so, whether it affected their ability to sit on the jury.  Id. at 6287-88, 6342-60 (JTT4 at 185-86, 240-58).  Three jurors heard Dr. Sabow say "sustained."  Id. at 6351-52, 6354, 6357-58 (JTT4 at 249-50, 252, 255-56).  A fourth juror heard someone talking but could not discern the content of what was said.  Id. at 6343-44 (JTT4 at 241-42).  Only one of the jurors identified who made the comment.  Id. at 6354 (JTT4 at 252).  The trial court did not call a mistrial and did not banish Dr. Sabow from the courtroom, but the court admonished him not to make any further outbursts and warned Dr. Sabow that he was on "thin ice" with the court.  Id. at 6365-67 (JTT4 at 263-65).

24

'totally incompetent,' 'grossly incompetent.' "  Id. at 17-18.[12]  The court found it
would have hurt Mr. Patterson's other defense experts to have Dr. Sabow
condemn even the defense experts as "incompetent."  Id. at 18.

Other examples of Dr. Sabow's hubris that were articulated by the state
habeas court included Dr. Sabow testifying that he is an expert "in all . . .
things" medical, who was more knowledgeable about reading T.R.'s CT scan
than Dr. Dubois, who was a board-certified pediatric radiologist.  Id.
Dr. Sabow also held himself superior to the board-certified pathologist,
Dr. Habbe, even though Dr. Sabow is not similarly credentialed.  Id.

Dr. Sabow testified bluntly that none of the doctors who testified at trial
"know squat about neurology" because "neurology [i]s too difficult [for them] to
understand."  Id.  Dr. Sabow also opined that he knew more about head
trauma than any neurologist in the country.  Id. at 18-19.  Despite his
boasting, Dr. Sabow testified to not having had any experience in treating
pediatric inflicted head trauma cases.  Id. at 19.

This court concludes that the state habeas court's findings of fact
regarding Dr. Sabow enjoy reasonable support in the record.  Accordingly,

---

[12] Respondent's counsel asked Dr. Sabow at the habeas hearing whether it was
his opinion that "every prosecution expert was grossly incompetent."  Patterson
v. Sullivan, 41CIV18-672 at 728 (HT1 at 195).  Dr. Sabow responded "No, I
think they could have been very competent pediatricians, but they, they really
didn't understand neuro head trauma."  Id.  Counsel then reminded Dr. Sabow
that he had testified at his earlier deposition that all the state's experts were
grossly incompetent, to which Dr. Sabow responded "I still agree with that,
yes."  Id.  Dr. Sabow had testified at his deposition that all the defense experts
were also totally incompetent.  Id. at 729 (HT1 at 196).  When asked about this
statement at the habeas hearing Dr. Sabow replied, "they had no business
testifying in this case."  Id.

habeas relief will be denied on claim one as to the factual findings made by the state habeas court regarding Dr. Sabow's testimony.

### iii.    Dr. Travis Danielson's Testimony

Mr. Patterson called Dr. Travis Danielson to testify at the state habeas hearing.  Dr. Danielson is board certified in forensic pathology and neuropathology.  Patterson v. Sullivan, 41CIV18-672 at 837-38 (HT2 at 71-72). Dr. Danielson recited the fact that T.R. was deceased already at the apartment and was placed on life support for the purpose of preserving his organs for donation.  Id. at p. 850 (HT2 at 84).  The first CT scan done of T.R.'s brain showed no swelling or anoxic injury so T.R.'s death predated the swelling—the swelling did not cause the death.  Id. at 850-51 (HT2 at 84-85). Dr. Danielson explained that anoxic injury is almost the same as hypoxic—they both mean a lack of oxygen to the brain.  Id. at p. 851 (HT2 at 85).  The extreme swelling and pressure to T.R.'s brain developed later and was not present initially, therefore brain swelling could not have been the mechanism which put pressure on T.R.'s brain stem and stopped his breathing.  Id. at 851, 940-41 (HT2 at 85, 174-75).

Dr. Danielson testified that blunt force trauma did not cause T.R.'s death.  Id. at 853 (HT2 at 87).  He explained the subdural blood found in T.R.'s head upon autopsy could have been caused with little to no trauma through the process of T.R.'s resuscitation and subsequent development of intravascular coagulopathy.  Id. at 854 (HT2 at 88).  In Dr. Danielson's opinion, T.R.'s cause of death should have been characterized as "undetermined," but

should not have been definitely attributed to abusive head trauma. Id. at 855, 936 (HT2 at 89, 170).

Dr. Danielson admitted that some children may die without some of the markers he and Dr. Sabow were testifying were required, but in *this case* with *this child*, in order for T.R. to have died so quickly—within 4 to 7 minutes— there had to have been massive hemorrhage, a substantial or massive skull fracture, or massive brain contusions if abusive head trauma were the cause of T.R.'s death. Id. at 863-64 (HT2 at 97-98). See also id. at 931-33 (HT2 at 165-67).

However, Dr. Danielson conceded there is no medical literature that says you must have these elements (massive hemorrhage, skull fracture, etc.) in order to conclude that instantaneous death was due to abusive head trauma. Id. at 875-76 (HT2 at 109-10). He further agreed that the absence of skull fracture and contusion in T.R.'s case does not rule out abusive head trauma as the cause of T.R.'s death. Id. at 881 (HT2 at 115). Even Dr. Danielson's own opinion that T.R.'s cause of death should have been characterized as "undetermined" does not rule out the possibility that T.R. died as a result of abusive head trauma. Id. at 882-83 (HT2 at 116-17).

Dr. Danielson agreed that defense expert Dr. Waney Squier testified at Mr. Patterson's trial to basically the same thing that Dr. Danielson was testifying to at the habeas hearing. Id. at 893, 896, 900-01 (HT2 at 127, 130, 134-35). He also agreed Dr. Roland Auer's trial testimony was basically the same as his testimony. Id. at 896-98 (HT2 130-32). In fact, Dr. Danielson

testified that there was no deficiency in the medical evidence presented by the defense at Mr. Patterson's trial.  Id. at 906 (HT2 at 140).  Dr. Danielson also conceded that doctors in the mainstream of medicine could diagnose T.R.'s cause of death as resulting from abusive head trauma.  Id. at 928 (HT2 at 162). He also agreed that the constellation of medical findings made with regard to T.R. were sufficient to cause T.R.'s death.  Id. at 948 (HT2 at 182).

### iv.    Habeas Court's Findings as to Dr. Danielson

The state habeas court found that Dr. Danielson testified he could produce no studies that supported his opinion that instantaneous death in pediatric AHT cases requires a certain profile that T.R. did not meet, or certain injuries that T.R. did not have.  Docket No. 9-1 at 20.  The court also found that Dr. Danielson acknowledged that based on the medical evidence concerning T.R. that T.R. could have died from head trauma.  Id. at 26.  The court stated Dr. Danielson agreed doctors in the mainstream could have diagnosed the cause of T.R.'s death as abusive head trauma.  Id.  The court wrote that Dr. Danielson acknowledged that subdural hemorrhaging is not associated with non-traumatic events that cause people to stop breathing.  Id. at 28.

This court concludes that the state habeas court's findings of fact as to Dr. Danielson's testimony enjoy reasonable support in the record.

### b.    Was There an Unreasonable Application of Federal Law?

The Supreme Court has recognized that there are certain criminal cases where "the only reasonable and available defense strategy requires consultation

28

with experts or introduction of expert evidence." Harrington, 562 U.S. at 106.
But "[e]ven the best criminal defense attorneys would not defend a particular
client in the same way." Id. (citation omitted).  It is the rare situation where the
wide latitude afforded defense counsel in making tactical decisions is limited to
a single technique or approach.  Id.

The Supreme Court has stated that defense counsel's "selection of an
expert witness is a paradigmatic example of the type of strategic choice that,
when made after thorough investigation of the law and facts, is virtually
unchallengeable." Hinton v. Alabama, 571 U.S. 263, 275 (2014) (*per curiam*)
(quoting Strickland, 466 U.S. at 690) (cleaned up).  Although the Court held in
Hinton that the petitioner had satisfied the first prong of the Strickland test, it
did so because counsel had failed to investigate a legal issue and therefore
made a mistake of law (he did not investigate what state law provided for
indigent defendants in hiring experts), which resulted in his hiring of an expert
that he himself deemed inadequate.  Id. at 273-75.  This was clearly deficient
performance by the attorney in the Court's view.  Id.  Despite its holding in
Hinton, the Court stated that it did "not today launch federal courts into
examination of the relative qualifications of experts hired and experts that
might have been hired" in criminal cases.  Id. at 275.

A habeas petitioner asserting counsel was ineffective for failing to call an
expert must point to specific expert testimony or opinions which would have
been rendered and had the potential to change the outcome of his trial or
undermine confidence in the result at trial.  See Ashker v. Class, 152 F.3d 863,

876 (8th Cir. 1998) (finding no prejudice where defendant "made no showing that the relevant tests by an expert witness would have exculpated him"); Ellefson v. Hopkins, 5 F.3d 1149, 1150-51 (8th Cir. 1993) (*per curiam*) (trial counsel's strategy to forego calling expert and rely on cross-examination of prosecution expert deemed not ineffective assistance of counsel). See also Wildman v. Johnson, 261 F.3d 832, 839 (9th Cir. 2001) (petitioner failed to show ineffective assistance because he did not demonstrate how his case was prejudiced by not retaining an expert; "[petitioner] offered no evidence that an . . . expert would have testified on his behalf at trial. He merely speculates that such an expert could be found. Such speculation, however, is insufficient to establish prejudice.") (citation omitted). Here, Mr. Patterson introduced expert testimony at the state habeas hearing from Drs. Sabow and Danielson, as described above.

The state habeas court, applying Strickland, held that trial counsel's performance in not calling Drs. Sabow and Danielson (or experts like them) was not deficient performance. Docket No. 9-1 at 36, 38-40. The state habeas court also concluded that, even had trial counsel presented the expert testimony of Drs. Sabow and Danielson (or experts like them), there was not "a reasonable probability of a different outcome" in his case. Id. at 38-40.

Regarding the deficient performance prong, the court noted that counsel had identified Dr. Sabow as a potential trial witness before the trial, but he made a strategic decision not to call him at Mr. Patterson's trial. Id. at 39. Dr. Sabow had been observing the trial and had engaged in a loud-whisper

commentary on the evidence which some members of the jury heard.  State v. Patterson, 41CRI13-598 at 6286-87, 6343-44, 6351-52, 6354, 6357-58 (JTT4 at 184-85, 241-42, 249-50, 252, 255-56).  As a result of this conduct, the trial court told Dr. Sabow that if he committed another outburst he would be removed from the courtroom.  Id. at 6365-67 (JTT4 at 263-65).  In addition, the trial court had to *voir dire* the jury individually to ensure that Dr. Sabow's comments had not tainted the process.  Id. at 6342-60 (JTT4 at 240-58).  Trial counsel found Dr. Sabow's conduct embarrassing to the defense and worried that his conduct had impaired Dr. Sabow's standing with the jury.  Docket No. 9-1 at 16-17; Patterson v. Sullivan, 41CIV18-672 at 609 (HT1 at 76).  The state habeas court found that, under these circumstances, it was a strategic decision by trial counsel not to call Dr. Sabow as a witness and that the decision did not constitute deficient performance.  Cf. Docket No. 9-1 at 39.

Moreover, the state habeas court found that Mr. Patterson had not demonstrated prejudice.  Id. at 39-40.  First, the crux of Mr. Patterson's claim is that the experts he did present stated only that there should have been, or they would have expected to find, skull fractures, more bleeding, and physical damage to the victim's brain tissue or brain stem if the cause of the victim's death was trauma to the head.  See Docket No. 1 at 7; Docket No. 21 at 23.  Before the state habeas court, Mr. Patterson argued that counsel should have presented expert testimony that a conclusion that head trauma had occurred *could not be reached* without findings of significant blood, skull fractures, and

31

visible damage to the brain tissue or brain stem.  <u>See generally</u> <u>Patterson v.</u>
<u>Sullivan</u>, 41CIV18-672 at 534-961.

The state habeas court noted that the testimony of the habeas experts
was essentially cumulative of the testimony of the defense experts who *did*
testify at trial.  Docket No. 9-1 at 39.  Thus, trial counsel essentially did
provide the testimony Mr. Patterson argued counsel should have produced—
that one cannot diagnose head trauma without physical manifestation of the
injury in the brain itself.  <u>Id.</u>  Defense witness Dr. Julie Mack testified at trial
there was "not enough alteration of the anatomy [of the victim] . . to confirm
any impact."  <u>Id.</u> at 22 (quoting Jury Trial Transcript Vol. 5 ("JTT5") at 168/9).
Defense witness Dr. Waney Squier testified "if trauma is so severe that there's
immediate collapse and death, it means that the fibers of the brain have been
torn," but that there was "no evidence of direct mechanical trauma to the
tissues of the brain."  <u>Id.</u> (quoting Jury Trial Transcript Vol. 6 ("JTT6") at 28/1-
25, 44/24, 31/13, 41/21, 60/15, 70/10-25)) (alteration omitted).

Defense witness Dr. Roland Auer testified that if the victim was killed by
four impacts to his head, "you would see skull fractures and brain tissue
damage."  <u>Id.</u> at 23 (citing JTT6 at 137/23, 106/19).  Dr. Auer testified that in
order for the victim to have died so quickly, "you necessarily have to see brain
tissue damage" and "necessarily see a contusion on the brain."  <u>Id.</u> (citing JTT6
at 140/6-12).

Defense witness Dr. Janice Ophoven testified that if the victim died
suddenly and immediately, there must be "bruising to the brain itself" or other

"evidence of damage." Id. (citing JTT6 at 199/14, 200/1, 205/23, 222/5-16).

Before this court, Mr. Patterson tacitly agrees that the gist of what Drs. Sabow

and Danielson testified to at the habeas hearing *was* presented at the trial, but

using Drs. Sabow and Danielson would—Mr. Patterson argues—have presented

evidence which "would have been much more direct and clearer for the jury to

understand." Docket No. 21 at 28.

Furthermore, Mr. Patterson's two experts proffered at the habeas hearing

ultimately agreed that the medical findings regarding the victim could have

reasonably indicated the victim died as a result of head trauma. Patterson v.

Sullivan, 41CIV-18-672 at 784, 799, 812-13, 880, 883, 887, 915, 917, 921,

925-26, 928 (HT2 at 18, 33, 46-47, 114, 117, 121, 149, 151, 155, 159-60,

162). Dr. Danielson agreed that the testimony presented at trial through

Dr. Squier and Dr. Auer was essentially the same testimony Dr. Danielson

presented at the habeas hearing. Id. at 893, 896-98, 900-01 (HT2 at 127, 130-

32, 134-35).

The difference, then, between the evidence trial counsel *did* present at

trial and the evidence Mr. Patterson says he *should have* presented is paper-

thin. Trial defense experts did testify that head trauma must result in visible

damage and that there was no such damage, or it was not significant enough

and, therefore, one could not conclude T.R. suffered head trauma. Habeas

experts testified the same. Habeas experts also conceded that a medical expert

could reasonably conclude the victim died of head trauma based on the

medical findings the victim exhibited. This is a difference—if there is one--in

33

slight degree only between the defense's expert testimony at trial and that of the expert testimony proffered at the state habeas hearing. In fact, at the habeas hearing, trial counsel testified that one reason he decided not to call Dr. Sabow to testify at trial was because he felt he had already established through the five other defense experts all the points he wanted to establish through Dr. Sabow. Id. at 583-84 (HT1 at 50-51).

"A state court's determination that a [habeas] claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington, 562 U.S. at 101 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Even where a petitioner presents a "strong case for relief [it] does not mean the state court's contrary conclusion was unreasonable." Id. at 102. Section 2254 bars federal relief except "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." Id. Section 2254 is only a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Id. at 102-03 (quotation omitted).

The court finds the state habeas court's application of Strickland was not unreasonable. When trial counsel makes a decision not to call a particular witness or type of witness, that decision is subject to a presumption that it was sound trial strategy so long as counsel made a reasonable investigation. Worthington v. Roper, 631 F.3d 487, 500 (8th Cir. 2011). Here, trial counsel did investigate and produced six prospective defense experts who he had

planned to have testify at Mr. Patterson's trial. One of those experts,
Dr. Sabow, is the same expert proffered at the state habeas hearing. Trial
counsel ultimately called five of his planned witnesses, but not Dr. Sabow.
Trial counsel made a strategic decision not to call Dr. Sabow after the doctor
drew unfavorable attention from the jury by commenting on the evidence as it
was presented at trial. Dr. Danielson, the other expert proffered at the habeas
hearing, was not identified prior to trial by trial counsel, but his testimony was
so similar to the defense expert testimony that was presented that it was
essentially cumulative.

A similar situation was presented in <u>Cole v. Roper</u>, 623 F.3d 1183 (8th
Cir. 2010). Cole alleged his trial counsel was ineffective for failing to present
expert testimony that he had been suffering "from extreme mental and
emotional disturbance at the time of the crime." <u>Id.</u> at 1189. Counsel had Cole
evaluated by two experts before trial, both of whom negated the theory that
Cole suffered from an extreme mental or emotional disturbance at the time of
the crime. <u>Id.</u> at 1189-90. Cole proffered a third psychiatric opinion at his
habeas hearing that Cole *was* suffering from an extreme emotional distress at
the time of the offense. <u>Id.</u> at 1190. Cole relied on this evidence to show that
trial counsel had been deficient. <u>Id.</u>

The court rejected this claim. <u>Id.</u> In addition to the two psychiatric
evaluations trial counsel had obtained prior to trial, the court noted counsel
interviewed Cole, who denied having any mental disease or defect and denied
being intoxicated. <u>Id.</u> Counsel also questioned Cole's family members about

Cole's mental status and use of alcohol and drugs.  Id.  As the court stated in another similar case where the petitioner argued counsel should have continued to seek out better expert opinions, "[t]rial counsel is not required by the Sixth Amendment to continue shopping for a[n expert] until a favorable opinion is obtained."  Forsyth v. Ault, 537 F.3d 887, 892 (8th Cir. 2008).  In the Harrington case, the Court held it was not deficient representation for trial counsel to have failed to consult with a blood expert at all.  Harrington, 562 U.S. at 106.

Here, the state court faithfully applied Strickland to Mr. Patterson's claim and determined trial counsel's performance was not deficient and there was no probability the result of the trial could have been different had the proffered expert testimony been presented at trial.  This was not an unreasonable application of Supreme Court law.  Accordingly, the court rejects Mr. Patterson's ineffective assistance of counsel claim.

In his brief, Mr. Patterson relies on state court cases[13] to support his argument that this court should grant habeas relief because of trial counsel's alleged deficient performance.  But those cases are distinguishable.  In Commonwealth v. Epps, 53 N.E.3d 1247, 1249, 1266, 1268 (Mass. 2016), trial counsel called *no* experts to counter the prosecution's expert medical testimony that the victim was injured as a result of traumatic brain injury due to being shaken.  Likewise in People v. Ackley, 870 N.W.2d 858, 860 (Mich. 2015), the

---

[13] Of course, state courts considering a Strickland claim must apply only one level of deference, while a federal court reviewing a state court's decision applying Strickland must apply two.  See Section B1, supra.

child victim died while alone in the defendant's care and the defendant's trial counsel called *no* experts to counter the prosecution's five medical experts who testified that the child died from blunt force trauma to the head or from shaking.  In fact, Ackley's lawyer didn't even *consult* any experts, nor did he read any medical treatises or articles about the medical issues in Ackley's case. Id. at 861.  Here, counsel *did* call five defense experts who gave testimony very similar to the proffered expert testimony at the habeas hearing.

Mr. Patterson also cites Sund v. Weber, 588 N.W.2d 223 (S.D. 1998), for the proposition that, had trial counsel presented the proffered experts' testimony at trial, there would have been a reasonable probability the result would have been different.  Docket No. 21 at 24.

In Sund, the circuit court judge who entertained Mr. Sund's state habeas petition found trial counsel's representation to be deficient.  Sund, 588 N.W.2d at 225-26.  Because the state did not file a notice of review as to this issue, the South Dakota Supreme Court accepted the circuit court's finding of deficient representation.  Id. at 226. The circuit court's conclusion of deficiency was based, in part, on the fact that trial counsel billed only 30 minutes of time pretrial until the day before Mr. Sund's trial was to begin.  Id. at 226 n.3.

Mr. Sund faulted his trial counsel because he had not investigated and called to testify at trial six witnesses, whose testimony would have tended to negate the specific intent element of the crime of theft by deception.  Id. at 225-27.  The appellate court reversed the circuit court's finding that Mr. Sund had not established Strickland prejudice and ordered a new trial.  Id. at 227.  Here,

counsel made a reasonable investigation of expert testimony and presented five of the six experts he identified.  The facts are simply different from <u>Sund</u> where the lawyer clearly did not investigate and did not present the six witnesses' testimony.

### c.    The Consensus Paper

Mr. Patterson's brief before this court contains much discussion of the "Consensus Paper."  Docket No. 21 at 35-38.  That paper is a meta-analysis of prior research on abusive head trauma; the consensus paper was not published until 2018, *after* Mr. Patterson's trial, which occurred in 2015. <u>Patterson v. Sullivan</u>, 41CIV18-672 at 1272; Docket No. 9-1 at 9.  Accordingly, trial counsel cannot have been ineffective for failing to introduce evidence about the consensus paper at Mr. Patterson's trial because the document did not exist at that time.

The consensus paper was addressed extensively in the state habeas court's decision because it was the centerpiece of Mr. Patterson's habeas claim of new evidence.[14]  In <u>Epps</u>, the Massachusetts Supreme Court declined to decide whether counsel's performance was deficient, but due to new scientific developments about shaken baby syndrome, they ordered a new trial so that a jury could have the benefit of the new science.  53 N.E.3d at 1259-68.  Relying

---

[14] At the state habeas level, Mr. Patterson argued that the consensus paper constituted new evidence which, together with Dr. Sabow and Dr. Danielson's testimony, should justify a new trial.  Mr. Patterson did not assert a claim of actual innocence, only an assertion of legal innocence due to the ineffective assistance of counsel and the state of medical science.  <u>Patterson v. Sullivan</u>, 41CIV18-672 at 546, 549 (HT1 at 13, 16).

on the <u>Epps</u> case, Mr. Patterson argued the state of scientific understanding of abusive head trauma had changed since Mr. Patterson's trial, that the consensus paper was new evidence of that new scientific understanding, and that therefore Mr. Patterson should be granted a new trial.  Cf. <u>Patterson v. Sullivan</u>, 41CIV18-672 at 473-75.

The state habeas court found the consensus paper was not "new evidence" because it was simply a compilation of decades of earlier research which predated the date of Mr. Patterson's trial.  Because no new evidence was being presented by Mr. Patterson, the state habeas court rejected his "new evidence" claim.  Docket No. 9-1 at 9-15, 36-38.

Mr. Patterson did *not* assert a new evidence claim in his federal petition. <u>See</u> Docket No. 1.  Because the new evidence claim is not before this federal court, and because it would have been an impossibility for trial counsel to have introduced the consensus paper into evidence at Mr. Patterson's trial (because that document did not yet exist), the consensus paper is not relevant to Mr. Patterson's ineffective assistance of counsel claim.

In any case, Mr. Patterson urges the importance of the consensus paper because he argues it supports his contention that there must be observable brain tissue damage in order to arrive at a diagnosis of AHT.  Docket No. 21 at 35-36.  But, as demonstrated by testimony at the habeas hearing in state court, AHT can be diagnosed from either focal brain tissue damage (which is observable) *or* from diffuse (which is not visible to the naked eye) brain tissue damage and either may be sufficient to cause death and to support a diagnosis

of AHT.  Patterson v. Sullivan, 41CIV18-672 at 803-04, 808, 810, 817-18 (HT2 at 37-38, 42, 44, 51-52, testimony of Dr. Sabow).  Furthermore, the subdural hematomas found at T.R.'s autopsy *were* visible injuries; the medical literature establishes these usually occur after head trauma and the occurrence of subdural hematomas in the absence of any trauma is "extremely rare."  Id. at 1290.

Finally, one of the purposes underlying the compilation of the consensus paper was to debunk the theory propounded in courtrooms that subdural hematomas and retinal hemorrhages can be caused by choking.  Id. at 1272-74.  If the consensus paper had been available at Mr. Patterson's trial and if it had been introduced by trial counsel, it would have undermined Mr. Patterson's own credibility.  A fact that trial counsel had to factor into his strategy at trial was that Mr. Patterson repeatedly told law enforcement that T.R. choked on a strawberry fruit snack.  Mr. Patterson did not testify at trial, but his statements were made known to the jury by multiple witnesses and the video of his three-hour interview with Sergeant Jessica Speckmeier.  The consensus paper presents some bits of medical science that might have helped Mr. Patterson in some ways, but it would have hurt his case in more important ways.  The court points out that the "choking theory" was not something trial counsel dreamed up.  Lawyers do not get to choose the facts in a case.  The choking theory was part of the case because Mr. Patterson himself repeatedly injected that explanation for T.R.'s death.

### d.    Totality of Evidence, Including Lay Witness Testimony

A final word about the state habeas court's finding regarding prejudice. The state habeas court's legal conclusions on Mr. Patterson's <u>Strickland</u> claim focused exclusively on expert testimony—because that was the exclusive focus of Mr. Patterson's state habeas petition. <u>See</u> Docket No. 9-1 at 38-40.  Before this court, Mr. Patterson continues to emphasize the expert testimony to the exclusion of other evidence—arguing that the battle of experts at his trial was an unfair battle and should therefore justify granting habeas relief.  Docket No. 21 at 30-33.  But this court notes that the evaluation of <u>Strickland</u> prejudice requires evaluation of *all* the evidence the jury heard and whether the newly proffered evidence creates "a probability sufficient to undermine confidence in [the] outcome" that the jury reached.  <u>Porter</u>, 558 U.S. at 44 (citation omitted).

Here, the jury heard not only expert testimony from both sides, but also lay testimony.  They heard from a former girlfriend of Mr. Patterson's that Mr. Patterson physically disciplined her children in extreme ways.  Jasmin Leach testified she had three sons, the youngest of which was Mr. Patterson's son, and that she and Mr. Patterson were in a relationship that spanned approximately three years.  <u>State v. Patterson</u>, 41CRI13-598 at 2861 (JTT3 at 7).  Ms. Leach testified that Mr. Patterson was very short-tempered with her sons, especially the two older children (who were still toddlers), and especially when the children whined, cried, or were cranky.  <u>Id.</u> at 2865-67 (JTT3 at 11-13).  Mr. Patterson complained nearly daily about the boys' whining or crying and his preferred method of discipline was spanking.  <u>Id.</u> at 2867 (JTT3 at 13).

41

In the summer of 2010, while on a road trip, Jasmin testified that one of her children was crying and Mr. Patterson pulled off the interstate onto an exit where he proceeded to "rip" the child out of his car seat and "throw" him up against the vehicle's rear tire. Id. at 2869-70 (JTT3 at 15-16). Mr. Patterson grabbed the child by the front of his shirt, pointed his finger in the child's face, and told him he would call the cops on the child if he didn't stop crying. Id. at 2870 (JTT3 at 16).

In the summer of 2011, Ms. Leach testified one of her other sons, who was three years old at the time, was crying and Mr. Patterson slapped the child across the face to make him stop crying. Id. at 2872-73 (JTT3 at 18-19).

In the summer of 2012, Ms. Leach testified Mr. Patterson spanked one of her toddler-aged sons 4 to 5 times as hard as he could on the child's bare butt. Id. at 2875 (JTT3 at 21). When Ms. Leach tried to intervene to stop Mr. Patterson, he removed the child into the laundry room, shut the door, and continued spanking him. Id. A photo taken of the toddler's butt two days after the incident showed open wounds and marks on his butt. Id. at 2879 (JTT3 at 25). Immediately after the spanking, Ms. Leach testified her son's butt looked like someone had sunk their hand into wet clay leaving handprints. Id. at 2876 (JTT3 at 22).

The jury also heard evidence of numerous texts from Mr. Patterson to Ashley Doohen, T.R.'s mother, to the effect that she needed to physically discipline T.R. more. Id. at 2433-36 (JTT1 at 92-95). Mr. Patterson told Ms. Doohen that T.R. needed to be spanked, especially when he was whining and

crying. Cf. id. at 2436 (JTT1 at 95). Ms. Doohen also testified that T.R. sustained numerous injuries while alone in Mr. Patterson's care such as a fat lip, a supposed bike wreck that left a mark that looked suspiciously like a handprint, a red spot on his eye that looked like broken blood vessels, and a cut lip. Id. at 2436-37, 2445, 2450-51, 2458-59 (JTT1 at 95-96, 104, 109-10, 118). Ms. Doohen testified that T.R. did not suffer injuries like this when he was in her care or when he was in the care of her daycare provider, Marilyn Knurck. Id. at 2462 (JTT1 at 121).

Ms. Doohen testified that Mr. Patterson became quickly agitated whenever T.R. would whine. Id. at 2457 (JTT1 at 116). She also testified that T.R. showed signs of increasingly being afraid of Mr. Patterson and not wanting to spend time with him. Id. at 2466 (JTT1 at 125). The more T.R. became afraid of Mr. Patterson, the more irritated, aggravated, and whiny T.R. became around Mr. Patterson, and Mr. Patterson's level of frustration with T.R. escalated dramatically. Id. at 2465-66 (JTT1 at 124-25).

The day before his death, T.R. defecated in the bathtub while he was alone in Mr. Patterson's care; Mr. Patterson texted a photo of T.R. to Ms. Doohen at the time of this incident in which Ms. Doohen testified T.R. looked "terrified." Id. at 2466-67 (JTT1 at 125-26). The day of T.R.'s death, Mr. Patterson sent a text to Ms. Doohen at roughly 11:40 a.m. saying he felt bitter at the world and expressing anger about the fact that T.R. had whined when Ms. Doohen woke T.R. up at 7 a.m. to take him to daycare. Id. at 2400, 2402-03, 2467-68 (JTT1 at 59, 61-62, 126-27).

Other evidence showed that Mr. Patterson consistently told police that T.R. choked on a red fruit snack and he produced a fruit snack that, when tested, had T.R.'s DNA on it. But neither Ms. Doohen nor any of the emergency responders or physicians found anything lodged in T.R.'s throat. And, although defense experts tried to explain away the subdural hematomas found under T.R.'s scalp upon autopsy and to suggest that T.R.'s brain swelling occurred much later and, therefore, was not a cause of death, even Dr. Sabow and Dr. Danielson could not explain away the retinal hemorrhages present in T.R.'s eyes which are a key indicator of head trauma.

It is to all this evidence, lay and expert alike, that the court evaluates how the addition of Dr. Sabow and Dr. Danielson's testimony (or other experts like them) could potentially have impacted the jury. Given that most of Dr. Sabow and Dr. Danielson's testimony was duplicative of other testimony presented by trial counsel at Mr. Patterson's trial, this court concludes the state habeas court did not unreasonably apply federal law in concluding no Strickland prejudice was shown.

Mr. Patterson argues that the expert evidence presented a close question, making the addition of Dr. Sabow and Dr. Danielson's testimony all the more important. Specifically, he argues that none of the state's experts could explain the mechanics of how T.R.'s brainstem shut down his breathing and heart when there was no observable damage to the brainstem in the CT scans that were taken or upon autopsy. Docket No. 21 at 28-30. This argument ignores Dr. Danielson's testimony at the habeas hearing explaining that, even if

44

T.R.'s brainstem showed no observable damage at autopsy, it is possible that intercranial pressure in T.R.'s skull put pressure on the brain stem, causing it to shut down T.R.'s breathing and, that if this is what happened in T.R.'s case, you would not see damage to the brain stem at autopsy.  Patterson v. Sullivan, 41CIV18-672 at 943-45, 947 (HT2 at 177-79, 181).

Mr. Patterson entrusted the outcome of his case to 12 peers from the community, the jury.  Once a jury has determined the matter, it is in only very extraordinary cases that a judge will step in and take that decision away from the jury.  State v. Patterson, 41CRI13-598 at 4450-52 (comments of the trial court at sentencing).  Four courts before this magistrate judge have examined the evidence adduced at trial, the jury instructions given, and the conduct of trial counsel and determined the jury's verdict must stand.  This court, applying the standards required by § 2254, concludes none of those prior judges' determinations unreasonably applied Supreme Court law nor were their factual conclusions based upon unreasonable interpretations of the evidence. Habeas relief is not warranted on claim one.

## C.    Claim 2—Prosecution's Closing Argument

### 1.    Fair Trial Standard

Claims 2, 3 and 4 all center on Mr. Patterson's claimed violation of his Sixth Amendment right to a fair trial.  Neither party sets forth in their pleadings what the standard applicable to such a claim is.

The Sixth Amendment provides:

> In all criminal prosecutions, the accused shall enjoy the right to a
> speedy public trial, by an impartial jury of the State and district

> wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S. Const. amend. VI.

In claims 2, 3 and 4, Mr. Patterson does not allege that any of the specific guarantees of the Sixth Amendment were violated. That is, he does not allege he was not given a speedy public trial, that he was not informed of the nature and cause of the accusation against him, or that he was denied the use of compulsory process for obtaining witnesses in his favor. Instead, he alleges his right to a "fair trial" was violated. As can be seen from the above, the words "fair trial" do not appear in the text of the Sixth Amendment. However, the courts have construed the Sixth Amendment to include a guarantee of a fair trial. See, e.g., Neb. Press Ass'n v. Stuart, 427 U.S. 539, 551 (1976); Hellum v. Warden, U.S. Penitentiary—Leavenworth, 28 F.3d 903, 907 (8th Cir. 1994).

All three of Mr. Patterson's remaining claims center on the admission or exclusion of evidence at his trial. "On habeas review, evidentiary errors are only relevant to the extent that the presentation or admission of particular proof infringed on 'a specific constitutional protection or was so prejudicial as to deny due process.'" Henderson v. Norris, 118 F.3d 1283, 1286 (8th Cir. 1997) (quoting Hobbs v. Lockhart, 791 F.2d 125, 127 (8th Cir. 1986)). "Only evidentiary errors that are so grossly prejudicial that they fatally infect the entire trial, preventing it from being fundamentally fair, will justify habeas

46

corpus relief." Id.  The court reviews the totality of the facts in the case to determine the fairness of a particular evidentiary decision.  Id.

### 2.    Application of the Standard to the State's Closing Argument

In closing, the prosecutor argued a theory of the case asserting that T.R. was watching television, then Mr. Patterson switched the television to a sports channel, which caused T.R. to whine or cry, which provoked Mr. Patterson to strike T.R. with four blows to the top of his head, which resulted in T.R.'s death.  State v. Patterson, 41CRI13-598 at 4240, 4243  (JTT10 at 12, 15).  In this habeas petition, Mr. Patterson argues that this argument by the prosecution had no basis in the evidence presented at trial and, therefore, the argument violated his constitutional right to a fair trial.  Docket No. 1 at 7.

The evidence at trial was that in the time period immediately prior to T.R.'s death, Mr. Patterson told Sgt. Speckmeier that he had been watching ESPN, a sports channel, on television.  State v. Patterson, 41CRI13-598 at 2921 (JTT3 at 67).  He told Sgt. Speckmeier that he then put the video Turtle Tales on the television for T.R. to watch and left T.R. alone to go to the bathroom.  Cf. id.  Mr. Patterson told the detective that when he came back from the bathroom T.R. was lying unresponsive on the couch.

But police officer Joseph Martyna testified he responded to Mr. Patterson's apartment after the 911 call went out and stayed at the apartment for a period of time.  State v. Patterson, 41CRI13-598 at 6177-81 (JTT4 at 75-79).  He saw that the television was on and was playing a college football game or college football highlights.  Id. at 6184 (JTT4 at 82).  Officer

47

Martyna testified there was not a children's cartoon playing on the television. Id. Officer Martyna testified he actually observed the television and was the one who turned the tv off when he and Mr. Patterson left the apartment.  Id.

As discussed above at the end of the analysis of claim one, there was much evidence introduced that Mr. Patterson disliked toddlers' whining or crying and that he would react violently to try to stop such behavior from a child.  Earlier in the day on October 9, 2013, Mr. Patterson had texted Ashley Doohen at 11:40 in the morning, writing:  "It's like I'm turning bitter at the world and WTF [T.R.] really start whining again at 7:00 a.m.?  Really?  First thing, whining, crying, acting like a baby."  Id. at 2467-68 (JTT1 at 126-27). Obviously, Mr. Patterson had a strong reaction to T.R. whining at 7 a.m. on October 9, 2013, if he was still complaining about it over four hours after it had occurred.

It is clear from this evidence adduced at trial that there was nothing unfair about the prosecutor's closing argument.  If Mr. Patterson did put Turtle Tales on the television for T.R. as he told Sgt. Speckmeier, then he must have changed the television to college football when he came back from the bathroom or before he went to the bathroom.  This would be likely to cause T.R. to whine or cry (Mr. Patterson testified T.R. had been sick for several days and was "lethargic"), which in turn might have provoked Mr. Patterson to a violent reaction as he did with Jasmin's toddlers and as he did with T.R. himself on previous occasions.

48

It is unlikely in the extreme that Mr. Patterson returned from the bathroom, found T.R. unresponsive, and *then* switched the television channel to college sports while he was calling 911, while watching Ms. Doohen administer CPR, or while emergency personnel were arriving. The logical inference is that Mr. Patterson switched the television to sports *before* T.R. became unresponsive, not afterward. If T.R. was still conscious when the channel was changed, the only thing missing from the evidentiary chain was T.R.'s reaction when Mr. Patterson turned off <u>Turtle Tales</u> and resumed watching sports.[15] The state supreme court committed neither an error of law nor one of fact in rejecting this claim in Mr. Patterson's direct appeal. <u>Cf.</u> <u>James v. Bowersox</u>, 187 F.3d 866, 869-71 (8th Cir. 1999) (rejecting a claim of prosecutorial misconduct in closing argument premised on the due process clause).

---

[15] Respondent asserts that Mr. Patterson told "detectives that T.R. was being 'cranky' and pointing at the TV." Docket No. 10 at 19. The citations respondent cites to do not support the proposition that Mr. Patterson told detectives that T.R. became cranky when he changed the TV from <u>Turtle Tales</u> to ESPN. The first citation is to a prosecutor's question, not an answer; the question was objected to, and the objection was sustained. <u>State v. Patterson</u>, 41CRI13-598 at 2921-22 (JTT3 at 67-68). A prosecutor's question is not evidence. In the second citation, a detective testified that Mr. Patterson repeatedly described T.R. as "lethargic," but not "cranky" and neither of these descriptions was tied to what was playing on TV. <u>Id.</u> at 2951 (JTT3 at 97). The final citation is to state's trial exhibit 15 at 17:56:36 and 17:57:48. This was a video recording of an interrogation of Mr. Patterson by Sgt. Speckmeier on October 10, 2013. At these two cited junctures, Mr. Patterson told the officer that T.R. was pointing at the TV and that T.R. was watching his movie and eating his fruit snacks immediately before Mr. Patterson went to the bathroom. Mr. Patterson never stated that T.R. was pointing at the TV and being upset at what was playing on the TV.

The "fair trial" test relative to a prosecutor's argument is whether that argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process." <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986) (citation omitted).  Here, this court cannot conclude that the prosecution's "connecting the dots" between discrete evidentiary facts which were in evidence was unfair, and certainly not so unfair as to make Mr. Patterson's conviction a denial of due process.  The South Dakota Supreme Court did not unreasonably apply Supreme Court precedent in rejecting this claim.

Mr. Patterson argues that the trial court made multiple errors and that the cumulative effect of those errors, including the error of the prosecution's closing argument, should be considered when determining if Mr. Patterson was prejudiced.  Docket No. 21 at 42.  Here, Mr. Patterson attempts to boot-strap in an argument that is not present in his petition by asserting that it was also error for the trial court to have admitted the Rule 404(b) evidence from Jasmin. <u>Id.</u> at 42-43.  Mr. Patterson argues the prosecutor's closing argument was based *solely* on the Rule 404(b) evidence as T.R. had no external bruising or marks.  <u>Id.</u> at 42-44. The court rejects this cumulation argument for numerous reasons.

There is no claim asserted in Mr. Patterson's petition that the trial court erred in admitting Rule 404(b) evidence.  <u>See</u> Docket No. 1.  The court will not decide a claim that is not pled in the petition.

Second, the Eighth Circuit has rejected the argument that a cumulation of errors may be the basis for habeas relief.  Henderson, 118 F.3d at 1288; Scott v. Jones, 915 F.2d 1188, 1191 (8th Cir. 1990).  Instead, each habeas claim must stand or fall on its own merits.  Id.

And, finally, the prosecutor's argument did *not* rely *only* on the Rule 404(b) evidence.  There was testimony at trial that T.R. had four subdural hemorrhages evidencing trauma.  State v. Patterson, 41CRI13-598 at 6247-51 (JTT4 at 145-49).  Dr. Habbe testified it was his opinion these hematomas resulted from four distinct impacts to T.R.'s head.  Id. at 6251-53 (JTT4 at 149-51).  While Dr. Sabow disputed whether these hematomas were evidenced on the CT scan, the existence of the hematomas were verified by Dr. Habbe upon autopsy.  Id.  No defense expert refuted the *existence* of these hematomas upon autopsy; they only opined that the hematomas were not significant enough to produce T.R.'s death.  The prosecutor's reference to "four blows" to T.R.'s head was directly linked to the evidence of the four subdural hematomas found by Dr. Habbe and attributed by him to blunt force trauma to T.R.'s head delivered in four blows.  Id. at 149.  Thus, the prosecutor relied upon evidence from T.R.'s circumstances to make her argument.  The argument was not based solely on evidence of other acts Mr. Patterson committed in conjunction with children other than T.R.

The court denies habeas relief on claim two.  The prosecutor did not commit misconduct; the trial court did not err in allowing the argument; given

the totality of the evidence at trial any prejudicial effect if the argument was improper did not amount to a denial of Mr. Patterson's due process rights.

## D.    Claim 3—Experts Invading the Province of the Jury

### 1.    Exhaustion

In claim three Mr. Patterson asserts his Sixth Amendment right to a fair trial was violated by the trial court when the trial court allowed the prosecution to present expert testimony that the victim died from "abusive head trauma and other similar diagnoses."  Docket No. 1 at 7-8.  A federal court may not consider a claim for relief in a habeas corpus petition if the petitioner has not exhausted his state remedies.  28 U.S.C. § 2254(b)(1)(A).  "[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."  O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999).

If a ground for relief in the petitioner's claim makes factual or legal arguments that were not present in the petitioner's state claim, then the ground is not exhausted.  Kenley v. Armontrout, 937 F.2d 1298, 1302 (8th Cir. 1991).  The exhaustion doctrine protects the state courts' role in enforcing federal law and prevents the disruption of state judicial proceedings.  Rose v. Lundy, 455 U.S. 509, 518 (1982).  The Supreme Court has stated:

> Because "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation," federal courts apply the doctrine of comity, which "teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter."

Id. at 518 (quoting Darr v. Burford, 339 U.S. 200, 204 (1950)).  This rule requires state prisoners to seek complete relief on all claims in state court prior to filing a writ of habeas corpus in federal court.  Federal courts should, therefore, dismiss a petition for a writ of habeas corpus that contains claims that the petitioner did not exhaust at the state level.  See 28 U.S.C. § 2254(b)(1)(A); cf. Rose, 455 U.S. at 522.

"A claim is considered exhausted when the petitioner has afforded the highest state court a fair opportunity to rule on the factual and theoretical substance of his claim." Ashker v. Leapley, 5 F.3d 1178, 1179 (8th Cir. 1993). A federal court must determine whether the petitioner fairly presented an issue to the state courts in a federal constitutional context.  Satter v. Leapley, 977 F.2d 1259, 1262 (8th Cir. 1992).  "To satisfy exhaustion requirements, a habeas petitioner who has, on direct appeal, raised a claim that is decided on its merits need not raise it again in a state post-conviction proceeding."  Id.

This "court must determine if the petitioner fairly presented the federal constitutional dimensions of his federal habeas corpus claim to the state courts." Smittie v. Lockhart, 843 F.2d 295, 296 (8th Cir. 1988) (quotation omitted).  Fairly presenting a federal claim requires more than simply going through the state courts:

> The rule would serve no purpose if it could be satisfied by raising one claim in the state courts and another in the federal courts. Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies.

>Accordingly, we have required a state prisoner to present the state
>courts with the same claim he urges upon the federal courts.

Picard v. Connor, 404 U.S. 270, 276 (1971).  It is also not enough for the

petitioner to assert facts necessary to support a federal claim or to assert a

similar state-law claim.  Class, 5 F.3d at 1179 (citation omitted).  The petitioner

must present both the factual and legal premises of the federal claims to the

state court.  Smittie, 843 F.2d at 297 (citing Laws v. Armontrout, 834 F.2d

1401, 1412 (8th Cir. 1987)).  "The petitioner must 'refer to a specific federal

constitutional right, a particular constitutional provision, a federal

constitutional case, or a state case raising a pertinent federal constitutional

issue.' " Class, 5 F.3d at 1179 (quotation omitted).  This does not, however,

require petitioner to cite "book and verse on the federal constitution."  Picard,

404 U.S. at 278 (quotation omitted).  The petitioner must simply make

apparent the constitutional substance of the claim.  Satter, 977 F.2d at 1262.

Mr. Patterson did not present claim three in his state habeas petition.

See Patterson v. Sullivan, CIV 18-672 at 1149 (state habeas court decision

setting forth the claims presented for decision).  Therefore, if this claim is

exhausted at all, it would only be through the vehicle of Mr. Patterson's direct

appeal of his conviction.  Mr. Patterson asserts he raised the constitutional

claim presented to this court in claim three in his direct appeal.  Docket No. 21

at 16.

In the South Dakota Supreme Court's opinion on Mr. Patterson's direct

appeal, there is no mention of "fair trial," "Sixth Amendment," or "constitution"

in connection with claim three—the assertion herein that the trial court

violated Mr. Patterson's Sixth Amendment right to a fair trial through allowance of the state's expert testimony.  Patterson, 904 N.W.2d at 50-51.

In Mr. Patterson's briefs on appeal, he made no mention of a "fair trial," the "Sixth Amendment," or the Constitution in setting forth and arguing the claim regarding the prosecution's introduction of expert testimony.  See State v. Patterson, S.D. Sup. Ct. No. 27736 at 42-47, 164-66.  In his direct appeal briefs Mr. Patterson discussed only state rules of evidence and state cases.  Id.

Mr. Patterson did cite to two United States Supreme Court cases in the section of his initial brief dealing with the state's introduction of expert testimony.  Id. at 42.  However, one of those cases was a civil matter and dealt only with application of Federal Rule of Evidence 702 under Daubert, not any constitutional issue.[16]  Id.  The other case dealt with a mistake in admitting evidence at a federal sentencing hearing.[17]  Id.  Neither Supreme Court case dealt with the Sixth Amendment or a "fair trial."  This court concludes claim three presented in this court—a claim that Mr. Patterson's Sixth Amendment right to a fair trial was violated by the state's introduction of expert evidence— was simply never presented *as a constitutional claim* to any state court for decision.

---

[16] See State v. Patterson, S.D. Sup. Ct. No. 27736 at 42 (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999) (discussing Fed. R. Evid. 702 as applied in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993))).

[17] See id. (citing Koon v. United States, 518 U.S. 81, 100 (1996)).

In its motion to dismiss, respondent has not argued that claim three is not exhausted.  See Docket Nos. 10 & 22.  Upon inquiry by this court,[18] respondent indicated that she believed claim three to be exhausted but, in any case, were not seeking to raise the defense of failure to exhaust.  Docket No. 24.  Because failure to exhaust is a waivable defense and respondent does not wish to raise the defense, this court turns to the merits of claim three.

### 2.    The Merits of Claim 3

This court's analysis of the South Dakota Supreme Court's decision is complicated by the fact that no constitutional claim was raised by Mr. Patterson or perceived by the state court.  Instead, the court's decision proceeds along merely evidentiary lines of analysis.  Patterson, 904 N.W.2d at 50-51.

When a state court does not provide an analysis of the applicable federal constitutional law for a particular claim, this court must consider the state court's end result, compare that to federal Supreme Court precedent, and determine if the state court result is compatible with a not-unreasonable application of the federal precedent.  Harrington v. Richter, 562 U.S. 86, 98 (2011); James v. Bowersox, 187 F.3d 866, 869-70 (8th Cir. 1999); Sellan v. Kuhlman, 261 F.3d 303, 311-12 (2d Cir. 2001).

---

[18] The court made inquiry of respondent on this subject because the Antiterrorism and Effective Death Penalty Act of 1996 specifies that a federal court shall not deem a state to have waived the defense of failure to exhaust unless the state expressly waives the requirement.  See 28 U.S.C. § 2254(b)(3).

Prior to trial, defense counsel filed a motion *in limine* to prohibit the prosecution from introducing expert opinion testimony that would invade the province of the jury.  State v. Patterson, 41CRI13-598 at 240.  Counsel specifically sought to exclude any opinion that T.R. suffered from "abusive head trauma" because none of the state's experts were qualified to render such an opinion.  Id.  The motion sought to limit the state's experts to testifying as to a medical diagnosis that T.R. suffered from blunt force trauma to the head or a traumatic brain injury.  Id. at 241.

The trial court ruled that "abusive head trauma" ("AHT") is a recognized diagnosis by the American Academy of Pediatrics and under the International Classification of Diseases for morbidity coding, diagnosis, and external cause of injury codes.  Id. at 859 (9-9-14 Motions Hearing Transcript ("MT") at 8).  The court then reviewed the education, certifications, credentials, and experience of Dr. Hsu, Dr. Casas-Melley, Dr. Miller, Dr. Segeleon, and Dr. Black, including the fact that these experts were actually involving in treating T.R., and found that each of them was qualified to testify as an expert in the diagnosis and treatment of AHT, that their proffered testimony was relevant, and that their testimony was based on a reliable foundation  Id. at 859-64 (MT at 4-9).  The court concluded each such expert's testimony was admissible by a preponderance of the evidence.  Id.

The court also reviewed Dr. Free's education, certifications, credentials, and experience, including the fact that she was consulted concerning T.R.'s

diagnosis and treatment, and similarly found her testimony relevant, reliable and admissible.  Id. at 862 (MT at 7).

The court reviewed Dr. Osmundson, who was consulted as an ophthalmologist.  Id. at 862-63 (MT at 7-8).  The court noted that the American Academy of Pediatrics recommends that, in diagnosing AHT, attending physicians should consult with other experts, including ophthalmologists.  Id. The court concluded Dr. Osmundson was qualified as an expert, that his testimony was relevant, reliable, and admissible.  Id.

The court reviewed Dr. Tufty's qualifications as a pediatric ophthalmologist and concluded he was qualified to testify about AHT as an expert, that his testimony was relevant, reliable, and admissible.  Id. at 863.

Finally, the court reviewed the education, training, credentials, certifications, and experience of Dr. Bunch and concluded Dr. Bunch was qualified to testify as an expert in the diagnosis and treatment of AHT, that her testimony was relevant, reliable, and admissible.  Id. at 864-65 (MT at 9-10).

On appeal, the South Dakota Supreme Court reviewed the trial court's evidentiary decision regarding the state's experts' testimony under an abuse of discretion standard, as is the normal standard for strictly evidentiary issues. Patterson, 904 N.W.2d at 50.  The court also noted that not all expert opinion which addresses an ultimate issue in a case is admissible.  Id. (citation omitted).  Expert opinions telling the jury what conclusion to reach are not permitted as they intrude upon the province of the jury.  Id.  The court held that its review of the trial testimony did not reveal a single instance where any

one of the state's experts crossed the line by telling the jury what conclusion to reach.  Id.  The court held the province of the jury had not been invaded and rejected this claim.  Id. at 51.

Before this court, Mr. Patterson urges a number of state court cases and two Supreme Court cases as authority for granting habeas relief on claim three.  Docket No. 21 at 44-47.  But all those cases merely analyze the issue under the rules of evidence.[19]  None of the cases contain discussion of when or how an evidentiary decision assumes a constitutional magnitude.  Id.

Mr. Patterson repeatedly argues that the state's experts' use of the terms "abusive" and "nonaccidental" told the jury, in essence, to reach a guilty verdict.  But Mr. Patterson never addresses the state trial court's finding of fact that AHT is a medical term of art and diagnostic label recognized by the American Academy of Pediatrics and under the International Classification of Diseases.  Nor does Mr. Patterson explain by what rule a court can require medical experts to explain their diagnosis in a trial without using the name of the diagnosis itself.

The prosecution's experts never opined that Mr. Patterson was a child abuser, that Mr. Patterson had struck T.R., or that Mr. Patterson was guilty.  See State v. Patterson, 41CRI13-598 at 2620-2819 (JTT2 at 32-231); 6232-6334 (JTT4 at 130-232); 3148-3255 (JTT5 at 4-111).  *These* are the ultimate

---

[19] See State v. Edelman, 593 N.W.2d 419, 421 (S.D. 1999); State v. Logue, 372 N.W.2d 151, 156 (S.D. 1985); Kumho Tire Co., 526 U.S. at 152; Koon, 518 U.S. at 100; State v. Raymond, 540 N.W.2d 407, 410 (S.D. 1995); State v. Packed, 736 N.W.2d 851, 862 (S.D. 1992); State v. Guthrie, 627 N.W.2d 401, 415 (S.D. 2001).

issues the jury had to decide.  Whether T.R.'s constellation of physical findings was consistent with a medical diagnosis of AHT—which is all the state's experts opined on—did not tell the jury *the source* of the trauma to T.R.'s head or the mental status of one who inflicted the trauma if a person was in fact responsible for inflicting the trauma.

This court concludes that the state supreme court's decision is consistent with reasonable factual findings in the record and is not contrary to established Supreme Court precedent.  The admission of the state's expert evidence did no "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process."  <u>Darden</u>, 477 U.S. at 181.   Accordingly, this court rejects claim three as a basis for affording Mr. Patterson habeas relief.

## E.    Claim 4—Third-Party Perpetrator Evidence

Mr. Patterson's petition alleges his right to a fair trial was violated when the trial court refused to allow him to introduce "additional instances" of bad conduct by a third-party perpetrator.  Docket No. 1 at 5, 8.  Mr. Patterson did not specify in his petition what the excluded evidence consisted of.  <u>Id.</u>

In his brief in opposition to respondent's motions to dismiss, Mr. Patterson is more specific:  the excluded evidence consisted of incidents detailed in Appendix A, filed in conjunction with his notice at the trial court level of his intent to introduce third-party perpetrator evidence.  Docket No. 21 at 13-14.

When trial counsel filed his notice of intent to introduce third-party perpetrator evidence about T.R.'s daycare provider, Marilyn Knurck, he attached a five-page appendix containing a summary of incidents involving Knurck.  State v. Patterson, 41CRI13-598 at 950-55.  That summary involved up to 18 different children (one of whom was Knurck's own daughter), only 11 of which were named or identified, and 22 separately chronicled incidents.  Id. Seven of the 22 incidents resulted in no bruising or other marks.  Id.  Some of the incidents involved mere sprains, scrapes, and scratches.  Id.

Of the more serious injuries, there was one incident with an unidentified child and unidentified parents where the child allegedly split his head open while in Knurck's care.  Id. at 950.  Another unnamed nine-month-old male suffered a broken tibia while in Knurck's care.  Id. at 951.

Carrie Lee Nytroe was helping Knurck at the daycare on the day of T.R.'s death so that Knurck could visit her daughter at the hospital.[20]  Id. at 953.  On that day, Nytroe's own child fell and cut her knee on an exposed carpet tack board and had to have stitches.  Id.

In Appendix A, Knurck was alleged to have battered her daughter variously by slapping her in the face, hitting her on the head, hitting her with a hairbrush, pushing her to the ground, pulling her hair, spraining her wrist, hitting her with a backpack, and stabbing her with a fork and knife.  Id. at

---

[20] Although this is what trial counsel alleged in Appendix A, Carrie Lee Nytroe testified at the trial that she was at Marilyn Knurck's daycare on October 9, 2013, only when dropping off and picking up her own children who were also in the same daycare.  Compare State v. Patterson, 41CRI13-598 at 953 (Appendix A), with id. at 6167-76 (JTT4 at 65-74).

950-52.  Child Protective Services ("CPS") investigated these incidents involving the daughter and determined there was no child abuse.  Id.  For example, after the daughter had reported that Knurck stabbed her with a fork and knife, the daughter later admitted her cutting wounds were self-inflicted.  Id. at 952.

The incident involving C.L., evidence of which *was* allowed at Mr. Patterson's trial, indicated he suffered scratches to his face, a lump on his head, a skull fracture, and a brain bleed after Knurck allegedly dropped him on his head accidentally.  Id.  Evidence showed C.L. had been diagnosed with brittle bone disease at birth; CPS investigated and determined there was not enough evidence to show child abuse.  Id.  H.S., the subject of another incident *allowed* to be introduced at trial, suffered bruises and scratches which a doctor found to be consistent with child abuse.  Id. at 954.

Marilyn Knurck was called as a witness and testified at Mr. Patterson's trial.  State v. Patterson, 41CRI13-598 at 6134-59 (JTT4 at 32-57).  She testified that she was holding C.L. on October 9, 2014, when she was distracted by other children and Knurck accidentally dropped C.L. on his head on a cement floor.  Id. at 6137 (JTT4 at 35).  When C.L.'s parent came to pick him up at daycare, Knurck initially did not disclose that C.L. had been dropped on his head.  Id. at 6144-45 (JTT4 at 42-43).  Later, when the parent called Knurck and indicated C.L. was injured, Knurck disclosed the incident.  Id.  Knurck testified C.L. had a brain bleed, a fractured skull, and required surgery.  Id. at 6137, 6144-45 (JTT4 at 35, 42-43).  Knurck also testified that C.L. suffered from brittle bone disease.  Id. 6137 (JTT4 at 35).  Knurck

admitted to being frustrated with C.L. when he was whiny.  Id. at 6150 (JTT4 at 48).

Knurck testified that H.S. received extensive bruises and scratches while Knurck was in another room and that Knurck did not know that H.S. had been injured at the time.  Id. at 6138-39 (JTT4 at 36-37).  She acknowledged that criminal charges were brought against her for child abuse or neglect.  Id. at 6139 (JTT4 at 37).  When H.S.'s parents came to pick him up, Knurck told them H.S. had a normal day.  Id. at 6146 (JTT4 at 44).  Knurck admitted she told another parent she had been frustrated with H.S. because H.S. kept getting in her way and that she had "plopped" H.S. down, but did not think she had caused any bruises.  Id. at 6147-48 (JTT4 at 45-46).

Knurck admitted that in March 2015 when H.S. was injured things were chaotic at her daycare.  Id. at 6157 (JTT4 at 55).  During that time period, Knurck had taken on a family of five that were very rough.  Id.

Knurck testified she would never have hurt T.R., that he was never injured while in her care, and that he was entirely normal on October 9, 2013. Id. at 6139, 6158 (JTT4 at 37, 56).  She also admitted that T.R. was a rambunctious child and that rambunctious kids can be frustrating.  Id. at 6155-56 (JTT4 at 53-54).

Knurck testified T.R. arrived at her daycare at 7:30 a.m. on October 9, 2013, and was picked up by his mom at 4:45 p.m.  Id at 6141-42 (JTT4 at 39-40).  He took an extra-long nap that day and had a loose stool, but was otherwise running around, laughing, having fun, and eating.  Id. at 6141,

6153, 6158 (JTT4 at 39, 51, 56). T.R. was not whiny or fussy on October 9 while he was at day care. Id. at 6158 (JTT4 at 56). When Ms. Doohen arrived to pick T.R. up, he ran to Knurck crying because he did not want to leave. Id. at 6141-42, 6158 (JTT4 at 39-40, 56). The only time T.R. cried on October 9, 2013, was when his mom arrived. Id. at 6157-58 (JTT4 at 55-56).

Carrie Nytroe also testified at Mr. Patterson's trial. She placed her twins in Knurck's daycare and also assisted Knurck from time to time. Id. at 6168-69 (JTT4 at 66-67). Nytroe was sometimes uncomfortable with the tone Knurck took with the children in her care as she would sometimes be stressed out. Id. at 6169 (JTT4 at 67). Nytroe described the tone Knurck took as like she was talking to dogs. Id. at 6175 (JTT4 at 73). Nytroe never witnessed Knurck getting physical with any of the kids at daycare. Id. at 6169 (JTT4 at 67).

Nytroe testified she knew T.R. and sometimes watched him. Id. at 6170 (JTT4 at 68). She remembered his smile, his happy attitude, and that he always had to have his blankie. Id. Nytroe never observed any unusual bruises or injuries on T.R. Id. Nytroe was at Knurck's daycare from about 4:30 to 5 p.m. on October 9, 2013, picking up her twins. Id. at 6170-71 (JTT4 at 68-69). T.R. was playing and acting normal. Id. When his mom arrived, he ran to Knurck, and she picked him up and T.R. gave Knurck a bear hug. Id. at 6171-72 (JTT4 at 69-70).

There are four types of incidents from the list of incidents submitted by trial counsel which the trial court did not allow: (1) incidents where the child

or its parents or both were unidentified; (2) incidents where there were no observable injuries or very minor injuries; (3) all the incidents involving Knurck's own daughter; and (4) the single incident involving Carrie Lee Nytroe's daughter.  Compare State v. Patterson, 41CRI13-598 at 950-55 (incidents listed in Appendix A), with id. at 1577, 2237-48 (decision by the trial court allowing the incidents involving C.L., H.S., and allowing information generally about Knurck and Nytroe).

As to the first category, any such alleged incidents had no probative value as they simply were not verifiable without a named child and/or named parent.  See id. at 950-55.  As to the second category of excluded incidents, those also had no probative value because the injuries (either no injury at all or very minor injuries) are not suggestive of child abuse and were not like T.R.'s injuries.  Id.

As to the incidents involving Knurck's daughter, those also lacked probative value for a number of reasons.  The reports were made in the wake of Knurck and her husband's divorce.  Id. at 950-55, 2216-48 (9-14-15 Motions Hearing Transcript ("MT2") at 7-39).  The daughter had mental health issues and "had spent time in behavioral health getting help."  Id. at 2233 (MT2 at 24).  And CPS had investigated the daughter's various complaints and found no basis for believing the daughter was being abused by Knurck.  Id. at 950-52.

Mr. Patterson specifically argues that the trial court should have admitted evidence regarding these children:  JT, WCW, ADP, LC and NW.  But JT exhibited only a minor injury, a lump on his head, that was incurred when

a swing hit him.  <u>State v. Patterson</u>, 41CRI13-598 at 955.  Although four-year-old WCW's allegations were florid, there were no corroborating marks or physical injuries found to support his account of Knurck's treatment of him.  <u>Id.</u>

LC had no identified parents listed for him in Mr. Patterson's Appendix A and there were no marks or physical injuries found on him to support his claims.  <u>Id.</u> at 953.  ADP had a thick scar on his ankle, but it was reported months after the scar was incurred and there was no explanation as to how he obtained the scar.  <u>Id.</u>

Although "NW" is mentioned in two comments in Appendix A, the appendix provides no details that assist the court in adjudicating this matter.  <u>See</u> <u>id.</u> at 953-54.  Specifically, one mention of NW indicates he/she only corroborated another child's story, not that NW was injured him/herself.  <u>Id.</u> at 953.  The other reference to NW indicates that there was inadequate information to either identify who NW was or to determine his/her age or injuries, if any.  <u>Id.</u> at 954.  Discussion by counsel and the court at the trial level of third-party perpetrator information reveals no mention of any child with the initials "NW."  <u>Id.</u> at 2216-48 (MT2 at 7-39).

Mr. Patterson was not deprived of a fair trial due to the trial court's exclusion of the trivial or unsubstantiated or explained accounts of abuse by JT, WCW, ADP, or LC.  As the trial court explained, incidents involving these other children were either not factually similar to T.R.'s injuries, the allegations regarding Knurck in these cases were dissimilar, or the injuries were

explainable by something other than child abuse.  Id. at 2242-48 (MT2 at 33-39). The state court that determined this issue was the South Dakota Supreme Court in Mr. Patterson's direct appeal.  Patterson, 904 N.W.2d at 51. Mr. Patterson does not identify how the supreme court unreasonably applied United States Supreme Court precedent or how the state court's factual findings did not enjoy reasonable support in the record.  See 28 U.S.C. § 2254(d); Docket No. 21.  This court, reviewing the state supreme court's decision, has identified no error of law or of fact under the standards imposed by § 2254(d).

When a fair trial claim under the Sixth Amendment is premised on alleged evidentiary errors, habeas relief will issue only where the error was so prejudicial, given the totality of evidence, that it denied the defendant's due process rights.  Darden, 477 U.S. at 181.  Here, the state supreme court's rejection of Mr. Patterson's claim based on exclusion of third-party perpetrator evidence is well supported factually and does not constitute an unreasonable application of Supreme Court law.  The trial court's decision did not prevent Mr. Patterson from presenting his theory of defense that Marilyn Knurck may have hurt T.R.; it only limited Mr. Patterson's presentation of evidence about Knurck to those instances bearing a reasonable similarity in time, place, and manner to T.R.'s injuries.  Accordingly, federal habeas relief is denied on Mr. Patterson's claim four.

**CONCLUSION**

Based on the foregoing facts, law and analysis, it is hereby

ORDERED that respondent's motions to dismiss, Docket Nos. 9 & 10, are granted.  It is further

ORDERED that Joseph Patterson's petition for a writ of habeas corpus is dismissed with prejudice.  It is further

ORDERED that based upon the reasons set forth herein and pursuant to Fed. R. App. P. 22(b), the court finds that the petitioner has not made a substantial showing of the denial of a constitutional right.  See 28 U.S.C. § 2253(c)(2).  Therefore, a certificate of appealability is denied.

DATED this 10th day of January, 2025.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge